NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2018 VT 38

Nos. 2016-417, 2017-208 & 2017-326

| | |
|---|---|
| Nicola Weaver | Supreme Court |
| | |
| | On Appeal from |
| v. | Superior Court, Addison Unit, |
| | Family Division |
| | |
| David Weaver | March Term, 2018 |

Samuel Hoar, Jr., J.

Nicola Weaver, Pro Se, North Ferrisburgh, Plaintiff-Appellant.

Wanda Otero-Weaver, Lincoln, for Defendant-Appellee.

PRESENT: Reiber, C.J., Skoglund, Eaton and Carroll, JJ., and Morris, Supr. J. (Ret.), Specially Assigned

¶ 1. **EATON, J.** In these consolidated appeals, mother, the noncustodial parent, challenges three successive orders of the family division that restricted and then temporarily suspended her contact with the parties' sixteen-year-old son. We affirm the court's restrictions on mother's contact with the child, but reverse its limitations on her access to the child's records and communications with school and medical personnel. We remand that issue for further findings and direct the family court to review its order suspending contact within sixty days.

I. Factual Background

¶ 2. This case has a long and contentious history including two previous appeals to this Court.[1] For purposes of the present appeal, the following facts are relevant. The parties divorced

_____

[1] The two prior appeals addressed father's maintenance obligation. See Weaver v. Weaver, 2017 VT 58, __Vt.__, 171 A.3d 374; Weaver v. Weaver, No. 2015-326, 2016 WL 562907 (Vt.

in August 2011 after a long marriage. They have four sons, all of whom were minors at the time of the divorce. The three older sons are now adults. The youngest, N.W., is sixteen years old. In the August 2011 final divorce order, the court awarded sole legal and physical parental rights and responsibilities to mother, who had been the primary caregiver throughout the children's lives. Father was to have contact with the children on three weekends each month. The court ordered each party to refrain from criticizing or disparaging the other parent, and warned that failure to comply could lead to contempt-of-court charges or other remedies including modification of the custody order.

¶ 3.      Three months later, in December 2011, the court modified physical parental rights and responsibilities. The court found that mother had interfered with father's parent-child contact by failing to bring the children to father as scheduled, saying that she was terminating all visitation because she was angry with father, having the police call father when he was with the children in Maine on vacation, and scheduling events during father's contact time. Mother was convicted for unlawful trespass and simple assault as a result of her behavior and was placed on probation until 2019. The court ordered the parents to share physical responsibilities so that father "is less at the mercy of mother's whims." It warned that a further change in custody was possible if mother's behavior continued.

¶ 4.      In May 2014, father moved to modify parental rights and responsibilities again, alleging that mother had repeatedly violated the court's orders by interfering with his parent-child contact, attempting to alienate the children from him, disparaging him to the children, and harassing him in other ways. Mother responded that father was angry that he was ordered to pay child support and maintenance, and that he and his new wife, who was also his attorney,[2] were

_____

Feb. 11, 2016) (unpub. mem.), https://www.vermontjudiciary.org/sites/default/files/documents /eo15-326.pdf [https://perma.cc/V3TB-NBCH]. A third, separate appeal of that issue is currently pending before this Court.

[2]   Mother argues in her brief that father's wife, Wanda Otero-Weaver, should not be permitted to act as his attorney in this matter because as father's wife and N.W.'s stepmother, Ms.

2

attempting to discredit mother in order to get custody of the children and reduce father's support obligations. The parties agreed to undergo a forensic psychological evaluation to aid the court in deciding the motion. The psychologist interviewed both parents, the children, and certain friends and family, and concluded that both parents loved the children and were able to care for them and meet their needs. However, the psychologist recommended granting sole parental rights and responsibilities to father, who appeared to be better able to execute those responsibilities and to communicate with mother.

¶ 5.     After two hearings, in June 2015 the court granted father's motion to modify parental rights and responsibilities. The court found that mother had continued to disparage father to the children and to involve the children in her dispute with father. She had threatened and harassed father's spouse. She refused to permit N.W., the parties' youngest son, to get braces, even though father arranged to pay the entire cost. She told the children they would become homeless because father would not support them. The court concluded that mother's intentional alienation of the children from father and failure to follow court orders constituted a substantial change in circumstances warranting modification of the custody award. The court determined that it would be in the children's best interests to transfer sole legal and physical rights and responsibilities for the children to father. It ordered the then-existing parent-child contact schedule of alternating weeks with each parent to remain in place. Once again, the court admonished mother not to threaten or harass father or his spouse, or criticize father or his spouse in front of the children. Mother did not appeal the June 2015 order.

Otero-Weaver has a conflict of interest. Mother did not file a motion to disqualify Ms. Otero-Weaver or otherwise squarely raise this argument in the family court in the proceedings currently being appealed. We accordingly take no position on this issue. See Follo v. Florindo, 2009 VT 11, ¶ 14, 185 Vt. 390, 970 A.2d 1230 ("In general, issues not raised at trial are unpreserved, and this Court will not review them on appeal."). However, we note that given her unique position, Ms. Otero-Weaver could become a fact witness in this proceeding, which would ordinarily preclude her from representing one of the parties.

3

¶ 6.    In February 2016, father filed a motion to modify parent-child contact. An evidentiary hearing was held on September 8, 2016. Mother did not appear. Based on the evidence presented at the hearing, the court issued a written decision on September 20, 2016, finding that mother had "persisted in her unremitting campaign to alienate her sons" from their father. The court found that mother had defied court orders, permitted N.W. to be tardy or absent from school on numerous occasions, and refused to acknowledge or participate in treatment of N.W.'s diagnosed eating disorder, to N.W.'s detriment. Although N.W. had expressed to the court his desire to maintain the current contact schedule, the court concluded that to do so would risk further harm to N.W. and to father's ability to exercise his responsibilities as N.W.'s legal custodian. The court therefore ordered that father would have primary custody of N.W. Mother would have contact with N.W. every other weekend and one weeknight visit each week and was responsible for transporting N.W. to and from father's home for visits. Mother was permitted to speak with N.W. by telephone for up to thirty minutes on each night N.W. was with father, but father could require N.W. to take the calls on speakerphone or monitor the calls, "[t]o ensure that [mother] does not use these calls as opportunities to extend her campaign of attempting to alienate [son] from [father]." The court warned that it could further limit mother's contact if she persisted in her attempts to undermine N.W.'s relationship with his father. Mother did not appeal the September 2016 order.

¶ 7.    A few weeks later, father filed a motion to enforce, alleging that mother had refused to comply with the new parent-child contact schedule set forth in the September 2016 order. Following a hearing at which both mother and father appeared, the court, on its own motion, further modified the parent-child contact schedule in an order entered on November 10, 2016. The court found that mother had "enabled, and perhaps even encouraged," N.W.'s disregard of the September 2016 order. The court found that mother had failed to return N.W. to father on each of the Sundays required by that order, with the excuse that she could not force N.W. to return to father's house. She had also violated the restrictions on contact by engaging in repeated electronic

4

communications with N.W. The court found that mother's "persistent attempts to alienate [N.W.] from his father are clear evidence of a relationship that is unhealthy for [N.W.]" and constituted a substantial change in circumstances requiring modification of the parent-child contact order.

¶ 8. The court further limited mother's contact with N.W. to the first and third full weekends of each month. Mother was responsible for picking him up after school on Friday and returning him to school the following Monday. She was permitted to call N.W. on Tuesdays and Thursdays at 8 p.m. for up to thirty minutes, and father could monitor the calls. Mother was prohibited from otherwise contacting N.W. by any electronic means or from responding to him if he contacted her. The court further ordered that mother could have access to N.W.'s medical, dental, and educational records, but that such access would be through father, who would obtain and deliver to mother any records she sought. She was also prohibited from contacting school personnel or N.W.'s medical and dental providers unless father gave her permission to do so. The court ordered mother to provide N.W. with a copy of the September 2016 order and the November 2016 order, to have him sign a written acknowledgement that he had read and understood both orders, and to return the signed acknowledgment to the court. The court stated that it would review the order within ninety days and would consider increasing mother's contact if mother demonstrated compliance. Mother appealed the order to this Court.

¶ 9. The family court held a review hearing in February 2017. Mother admitted that the parent-child contact schedule was not being followed. The court denied mother's requests to amend the temporary order and to allow her to take N.W. to England to visit her family during the summer, although it stated that it would reconsider the requests if mother demonstrated compliance with the November 2016 parent-child contact order.

¶ 10. The court held another hearing on May 10, 2017. Mother again admitted that the parent-child contact schedule set forth in the November 2016 order was not being followed. Father testified that N.W. had been staying at mother's home for most of the previous month and refused to answer his texts or calls. Father testified that he had received a letter from the school notifying

5

him that N.W. had more than ten absences and numerous tardies, almost all of which had occurred while N.W. was staying with mother. The court found that mother had continued to enable or encourage N.W. to violate the order and to violate the order herself. The court accordingly suspended mother's in-person parent-child contact, stating that it would consider reinstating contact after sixty days if mother could demonstrate "her appreciation of the negative impact her behavior has had upon [N.W.] and her active commitment to refraining from such behavior in the future." Mother filed a notice of appeal from the May 2017 order.

¶ 11. In response to a motion from mother, the family court clarified in a June 2017 order that if N.W. appeared at her home, mother was to transport him immediately to father's home, or, if he refused to cooperate, to call the police to transport him.

¶ 12. Mother subsequently moved to amend the parent-child contact order to return to the previous arrangement under which each party had equal time with N.W. Father, meanwhile, filed a motion for contempt.[3] At a status conference on July 6, 2017, mother stated that N.W. had been staying with her and refused to go to father's home. However, she had not contacted the police as ordered by the court.

¶ 13. In an order entered on August 24, 2017, the court found that neither party had complied with the court's orders: mother had continued to "use the parties' son as a pawn in her persistent campaign of revenge against [father]," while father had been unwilling or unable to exercise the rights and responsibilities awarded him by the court. The court found that the parties had empowered N.W. to make his own decisions, and that "[i]nfluenced heavily by his mother, [N.W.] has chosen to remain exclusively with her, in derogation of the court's order, and decidedly against his best interest." The court denied mother's motion to amend custody, finding that to do otherwise would reward mother for "what appears clearly to be contumacious conduct." The court

---

[3] The court eventually granted father's motion for contempt in a decision entered on October 24, 2017. Mother filed a separate appeal from that decision, which is pending. We therefore will not address mother's arguments regarding the contempt order in this opinion.

stated that its prior orders remained in effect and ordered that a hearing be set on father's motion for contempt. Mother filed a third notice of appeal from the August 2017 order. At the request of the parties, mother's appeals from the November 2016, May 2017, and August 2017 orders were consolidated for review by this Court.

## II. The Present Appeal

¶ 14.    On appeal, mother claims that there is no evidence that she has attempted to alienate N.W. from father and that the court abused its discretion by reducing and then suspending her parent-child contact. She argues that the court's decisions are not in N.W.'s best interests and that the court should have followed N.W.'s expressed wish to maintain the previous contact schedule. She further argues that the court improperly prohibited her from accessing N.W.'s records or having direct contact with school personnel or medical and dental providers.

¶ 15.    Our review of the family court's decisions regarding parent-child contact is deferential: we will uphold its findings if supported by the evidence, and will affirm its legal conclusions if supported by the findings. DeLeonardis v. Page, 2010 VT 52, ¶ 20, 188 Vt. 94, 998 A.2d 1072. The family court has broad discretion in awarding, modifying, or denying parent-child contact, and we will not disturb its decisions "unless its discretion was exercised upon unfounded considerations or to an extent clearly unreasonable upon the facts presented." DeSantis v. Pegues, 2011 VT 114, ¶ 26, 190 Vt. 457, 35 A.3d 152 (quotation omitted).

¶ 16.    We first address the scope of this appeal. Many of mother's arguments in her appellate briefs are focused on the court's September 2016 order, which reduced her parent-child contact with N.W. from alternating weeks to every other weekend and one weeknight visit a week. She claims that she did not appear at the hearing that preceded the September 2016 order because she was being bullied by father and his attorney in the maintenance dispute and had "surrendered" on the issue of custody. She questions the court's findings and reasoning in the September 2016 decision. However, mother did not appeal that order, which is final and can no longer be challenged. See LaMoria v. LaMoria, 171 Vt. 559, 560, 762 A.2d 1233, 1235 (2000) (mem.)

(holding that mother's failure to timely appeal prior order in custody case foreclosed her from raising claim related to prior order in later appeal). This Court therefore lacks jurisdiction to consider these arguments. See Casella Const., Inc. v. Dep't of Taxes, 2005 VT 18, ¶ 3, 178 Vt. 61, 869 A.2d 157 ("The timely filing of a notice of appeal is a jurisdictional requirement."). We may only address mother's claims regarding the November 2016, May 2017, and August 2017 orders, which mother timely appealed.

### A. November 2016 Order

### 1. Modification of Parent-Child Contact

¶ 17.   In her first appeal, mother challenges the court's November 2016 order modifying the parent-child contact schedule to reduce mother's time with N.W. and restrict mother's telephonic and electronic communications with N.W. Mother argues that these changes were not warranted by the evidence. She claims that she has attempted to comply with the court's orders but that N.W. refuses to do so and she is unable to control his behavior.

¶ 18.   As noted above, we review a court's decision to modify parent-child contact for abuse of discretion. DeSantis, 2011 VT 114, ¶ 26. To modify a parent-child contact order, the court must first determine whether there has been a "real, substantial, and unanticipated change of circumstances." 15 V.S.A. § 668(a); see also Patnode v. Urette, 2017 VT 107, ¶ 4, __Vt.__, __A.3d__. "The burden of showing changed circumstances with respect to a motion to alter parent-child contact is not as high as the heavy burden of showing changed circumstances with respect to a motion seeking a change of custody." Hawkes v. Spence, 2005 VT 57, ¶ 20, 178 Vt. 161, 878 A.2d 273 (quotation omitted). A parent's "willful, repeated interference" with physical rights and responsibilities of the other parent may constitute changed circumstances sufficient to justify modification. Wells v. Wells, 150 Vt. 1, 4, 549 A.2d 1039, 1042 (1988); see also Clark v. Bellavance, 2016 VT 124, ¶ 13, __Vt.__, 162 A.3d 679 (explaining that "efforts by one party to interfere with the other's visitation rights, especially when those efforts violate court orders," may constitute substantial change in circumstances).

8

¶ 19. In its November 2016 order, the court determined that there had been a legally sufficient change in circumstances because mother had failed to return N.W. to his father's house on Sundays as required by the September 2016 order, had deliberately ignored its restrictions on electronic communications with N.W., and had enabled or perhaps encouraged N.W. to disregard the new contact schedule. It determined that mother's actions were part of her ongoing campaign to undermine father's relationship with and authority over N.W and justified a further modification of the parent-child contact order.

¶ 20. The court's findings are supported by evidence presented at the November 3, 2016 hearing. Father testified under oath that mother had not been returning N.W. to his home as required by the September 2016 order, and had continued to contact N.W. on a daily basis through text messages and FaceTime. Mother did not deny these facts at the hearing. In emails introduced at the hearing, mother informed father that N.W. did not want to abide by the new schedule and "is sticking to 50/50." In another, she threatened father that he risked losing all contact with N.W. if he tried to enforce the order, stating that their older son "opted out at 15 and you will never get that time back, and [N.W] is looking at doing the same." In multiple emails, she accused father of fraud and of "screwing with [N.W.]" for father's own financial gain. Meanwhile, she emailed father's wife's law partner, attempting to involve him in the dispute. It was not unreasonable for the court to conclude from this evidence that mother was unwilling to follow the new visitation schedule and was enabling or encouraging N.W. not to do so. These findings in turn are sufficient to support the court's conclusion that a substantial change in circumstances existed. See Miller-Jenkins v. Miller-Jenkins, 2010 VT 98, ¶ 13, 189 Vt. 518, 12 A.3d 768 (mem.) (affirming family court's ruling that custodial parent's repeated interference with noncustodial parent's visitation rights constituted legally sufficient change in circumstances to review custody order).

¶ 21. When the threshold requirement of changed circumstances has been met, the court must then determine whether changes to the parent-child contact arrangement are in the best interests of the child. 15 V.S.A. § 668(a); Patnode, 2017 VT 107, ¶ 4. Although the court's

9

analysis of the best-interests prong in its November 2016 order is brief, its decision is sufficient for us to discern its rationale, particularly when read together with earlier orders. In its unappealed September 2016 order, the court had found that while in mother's care, N.W. had been permitted to miss school far too often, had become alienated from his father, and had not received treatment for his diagnosed eating disorder.[4] It limited mother's contact with N.W. in an attempt to address these issues. In the November 2016 order, the court found that mother had ignored the new contact schedule, to N.W.'s continuing detriment. Although the court acknowledged N.W.'s desire to maintain the old arrangement, it found that N.W.'s best interests were not served by extensive contact with mother, because she continued to undermine N.W.'s relationship with father by enabling or perhaps encouraging N.W. to disregard the new visitation schedule and by ignoring the court's restrictions on electronic communication, and because her fixation on the alleged wrongs perpetrated by father prevented her from seeing N.W.'s real needs for structure, discipline, and medical treatment. Accordingly, it further limited mother's contact with N.W.

¶ 22. The court's findings in the November 2016 order relate directly to several relevant best-interests factors: the parent's ability to meet the child's developmental needs, 15 V.S.A. § 665(b)(2); "the ability and disposition of each parent to foster a positive relationship and frequent and continuing contact with the other parent, including physical contact, except where contact will result in harm to the child or to a parent," 15 V.S.A. § 665(b)(5), and the parent's ability to communicate and cooperate with the other parent, 15 V.S.A. § 665(b)(8). Given its familiarity with the parties and the history of this case, we cannot find that the court abused its discretion in determining that further restrictions on face-to-face and electronic contact with mother were in N.W.'s best interests. See Miller v. Smith, 2009 VT 120, ¶ 5, 187 Vt. 574, 989 A.2d 537 (mem.)

---

[4] On appeal, mother denies that N.W. has an eating disorder, arguing that he is simply a vegetarian and a picky eater. As explained above, mother failed to appeal the court's September 2016 factual findings on this point, which are now final. Furthermore, mother's current position on appeal is contradicted by the 2015 psychologist report, which states that both mother and father reported "with concern" that N.W. suffered from a diagnosed eating disorder.

(recognizing that court "may impose conditions on visitation if clearly required by the child's best interests").

¶ 23. We reject mother's argument that the court abused its discretion by failing to defer to N.W's desire to continue spending equal time with both parents. "The paramount consideration in any custody decision . . . is the best interests of the child." Renaud v. Renaud, 168 Vt. 306, 309, 721 A.2d 463, 466 (1998). We have held that where one parent engages in a sustained campaign to alienate the child from the other parent, courts must be "wary . . . of over-reliance on such otherwise significant considerations as the child's emotional attachment to, or expressed preference for, the offending parent, or on such factors as stability and continuity." Id. at 310, 721 A.2d at 466. As we noted in Renaud, children's desires are "capable of distortive manipulation by a bitter, or perhaps even well-meaning, parent," and "do not always reflect the long-term best interest of the children." Id. (quoting Nehra v. Uhlar, 372 N.E.2d 4, 7 (N.Y.1977)). Furthermore, the brief disruption caused by a change in contact may be "more than compensated by the benefits of a long-term healthy relationship with both parents." Id. Here, the court found that N.W.'s expressed preference to spend equal time with each parent was not in his best interests because extensive contact with mother was detrimental to his own health and his relationship with father. The court's determination on this point is supported by its findings and the evidence, and we uphold it on appeal.[5]

_____

[5] We disapprove, however, of the court's order that N.W. read and sign its November 2016 decision, which was to be delivered by mother. Although not a basis for reversal, the order was ill-advised, as it needlessly further dragged N.W. into the middle of his parents' contentious legal battle and possibly increased resentment toward the court. To the extent that the court was attempting to ensure that N.W. understood for himself the court's reasoning for the new schedule, rather than hearing a potentially editorialized version of events from mother, the court could have accomplished this by directing the child's previously appointed guardian ad litem to speak with N.W. about the order, or by appointing an attorney for N.W. and directing that person to communicate with him.

## 2. Access to Records and Personnel

¶ 24.    Mother also challenges the restrictions placed by the court on her access to N.W.'s records and her ability to communicate with school and medical personnel regarding N.W.  In paragraph 1 of its November 2016 decision, the family court ordered that mother had the right to see N.W.'s records but had to ask father to obtain them, and that she was not permitted to have direct contact with school personnel or medical and dental providers without father's permission.  Mother argues that she has a statutory right of access to N.W.'s records and that it is not in N.W.'s best interests to prohibit her from contacting the school or his medical providers.

¶ 25.    Mother is correct that under 15 V.S.A. § 670, the noncustodial parent ordinarily has the right to access "medical, dental, law enforcement and school records" of a minor child.[6]  See Rinehart v. Svensson, 2017 VT 33, ¶ 14, __Vt.__, 169 A.3d 198.  The court may limit the noncustodial parent's access to such records, however, if it finds that "access is not in the best interest of the child or if access may cause detriment to the other parent including but not limited to abuse."  15 V.S.A. § 670.

¶ 26.    In Rinehart, we affirmed the trial court's order denying a father access to his sons' mental health records.  2017 VT 33, ¶ 17.  The court found that permitting father to access the records was not in the children's best interests, because disclosure of the records could inhibit the children's progress in treatment and cause them substantial emotional harm.  Id.  These findings related directly to two relevant best-interests factors: the parents' respective abilities to meet the children's future developmental needs and the relationship of the children to another person who may significantly affect them, namely, their therapist.  Id. (citing 15 V.S.A. § 665(b)(3), (7)).

¶ 27.    In this case, by contrast, the family court provided no explanation for its decision to limit mother's access to N.W.'s records.  There was some testimony at the November 2016

---

[6] Mother claims that she also has a right to access N.W.'s records under the federal Family Education Rights and Privacy Act of 1974.  We do not address this claim because it is inadequately briefed.  See State v. Mitchell, 147 Vt. 218, 221, 514 A.2d 1047, 1049 (1986) ("As a general rule, we will not consider inadequately briefed issues on appeal.").

hearing that mother had been making arrangements for N.W. with the school without notifying father. There was also evidence presented that mother had attempted to involve school personnel in her quarrel with father. However, the court's order contained no discussion of this evidence, any past history regarding N.W.'s records, or any potential effect that disclosure of the records to mother would have on N.W. or father. While § 670 permits the court to restrict the noncustodial parent's access to a child's records, such an order must be based on the criteria set forth in the statute. The court's November 2016 order restricting mother's access to N.W.'s records is unsupported by any findings or analysis and therefore must be reversed.

¶ 28. Mother appears to argue that, in addition to giving her a general right to access N.W.'s records, § 670 gives her the right to communicate directly with school and medical personnel regarding N.W. The language of § 670 does not support her interpretation and this Court is not aware of any other statutory provision granting mother such a right. As the parent with sole legal rights and responsibilities, father is responsible for all decisions regarding N.W.'s education and medical needs. See 15 V.S.A. § 664(1)(A) (defining legal responsibility to include decisions regarding "education, medical and dental care, religion and travel arrangements"). Just as it may restrict access to records, the family court may, in its discretion, restrict the participation of the noncustodial parent in communications with school and medical personnel if the court determines such restrictions are in the child's best interests.

¶ 29. Again, however, the court made no findings to support its restrictions on mother's right to communicate with school and medical personnel. We therefore cannot affirm this portion of the court's order. See Nickerson v. Nickerson, 158 Vt. 85, 89, 605 A.2d 1331, 1333 (1992) (reversing custody decision where lack of findings prevented meaningful appellate review regarding which parent was primary care provider).

¶ 30. For the above reasons, we reverse paragraph 1 of the November 2016 order. On remand, the court may reimpose restrictions on mother's access to records and personnel if warranted by the evidence, but any such restrictions must be supported by appropriate findings.

¶ 31.    In the second of her three appeals, mother challenges the family court's May 2017 order, which temporarily suspended all contact between mother and N.W. for sixty days after mother failed to comply with the September 2016 and November 2016 orders.

¶ 32.    The Legislature has declared that after parents divorce, "it is in the best interests of their minor child to have the opportunity for maximum continuing physical and emotional contact with both parents, unless direct physical harm or significant emotional harm to the child or a parent is likely to result from such contact."  15 V.S.A. § 650.  Accordingly, the family court may not permanently halt all contact between a parent and a child without finding by clear and convincing evidence that such an action is in the child's best interests, because such an order effectively terminates the parent's rights.  Mullin v. Phelps, 162 Vt. 250, 267, 647 A.2d 714, 724 (1994); see also In re A.D., 143 Vt. 432, 435, 467 A.2d 121, 123 (1983) (explaining that permanent termination of parental rights must be supported by clear and convincing evidence).

¶ 33.    We have recognized, however, that the family court may temporarily suspend parent-child contact when a preponderance of the evidence shows that a suspension is necessary to protect the child's physical or emotional welfare.  Groves v. Green, 2016 VT 106, ¶ 22, 203 Vt. 168, 154 A.3d 507; see also In re B.C., 2013 VT 58, ¶ 16, 194 Vt. 391, 81 A.3d 1152 (holding that temporary deprivation of rights may be justified by preponderance of evidence showing that suspension of contact is "necessary for the protection of the child's physical or emotional safety"); 15 V.S.A. § 594a (providing that family court may make temporary orders).  We apply a deferential standard of review in cases involving a temporary suspension of rights, and will not set aside the court's order if the findings and evidence support its conclusions.  Groves, 2016 VT 106, ¶ 23.

¶ 34.    Although the family court's May 2017 order is brief, it is clear from context that the court determined that it was in N.W.'s best interests to temporarily suspend contact with mother.  The order expressly incorporates the oral findings the court made at the May 2017 hearing.

14

There, the court found that despite its admonitions in November 2016 and February 2017, mother had persisted in her attempts to undermine N.W.'s relationship with father. She had enabled and encouraged N.W. to violate the order and had violated the order herself. The court found that mother had not acted in N.W.'s best interests. The court accordingly suspended all contact between mother and N.W. for sixty days, stating that it would consider reinstating contact if mother showed that she understood the impact her behavior had on N.W. and committed to changing her behavior.

¶ 35. The family court's findings and conclusions are supported by a preponderance of the evidence in the record. At the February and May 2017 hearings, mother admitted that the parent-child contact schedule was not being followed. By the time of the May hearing, father had not seen or heard from N.W. for nearly a month, despite making numerous attempts to contact him. N.W. had missed a lot of school and his grades were suffering. Father had arranged for N.W. to see a therapist to treat his eating disorder, but N.W. refused to engage with the therapist, apparently out of concern that anything he said to her would make it back to mother. Thus, he continued to go without treatment. This evidence supported the court's conclusion that extensive contact with mother was detrimental to N.W.'s well-being.

¶ 36. Mother claimed that she tried to get N.W. to communicate with father and insisted that she could not force N.W. to comply with the orders. However, she offered no evidence of any efforts on her part to ensure N.W.'s cooperation with the new schedule. As the finder of fact, mother's credibility was a question for the court to decide, and we cannot say that the court clearly erred by failing to credit mother's claim that she was not to blame for N.W's noncompliance. See Payrits v. Payrits, 171 Vt. 50, 54, 757 A.2d 469, 472-73 (2000) (holding that credibility of witnesses, weight of evidence, and its persuasive effect are questions for family court). Indeed, at the February 2017 hearing mother openly admitted that she did not even try to control N.W. or tell him that he had to go his father's. These facts support the court's conclusion that mother was enabling and encouraging N.W. to disregard the order as part of her continuing campaign to

15

alienate N.W. from his father, resulting in emotional harm to him and father. Under the circumstances, the court acted within its discretion by determining that it was in N.W.'s best interests to temporarily suspend contact with mother pending a review hearing after sixty days. See Groves, 2016 VT 106, ¶ 23.

### C. August 24, 2017 Order

¶ 37. In her third appeal, mother challenges the court's August 2017 decision denying her motion to modify parent-child contact and continuing the suspension of mother's parent-child contact.

¶ 38. We conclude that the court acted within its discretion because mother failed to demonstrate that she had met the court's stated conditions for reinstating contact, that is, compliance with the existing parent-child contact schedule, an acknowledgment by her of the negative impact of her behavior on N.W., and her promise to refrain from such behavior in the future. Mother admitted at the July 2017 hearing that she continued to have in-person contact with N.W. despite the court's May 2017 order suspending all contact; in fact, he had been staying with her most of the time since that order. She continued to insist that she could not force N.W. to see his father and denied any personal responsibility for his noncompliance.[7] Under these circumstances, it was not an abuse of discretion for the court to deny mother's motion to modify the parent-child contact order.

¶ 39. The court's August 2017 denial of mother's motion to modify parent-child contact meant that the May 2017 order temporarily suspending mother's contact with N.W. remained in effect. As discussed above, the court's suspension of mother's contact with N.W. in its May 2017 order was acceptable because the order was temporary and called for review within sixty days. Going forward, unless the court makes findings sufficient to satisfy the standard articulated in

---

[7] At oral argument, the parties represented that after mother was held in contempt in October 2017, N.W. began complying with the order and had been staying with his father, except for one or two overnights with mother.

16

<u>Mullin v. Phelps</u> for termination of mother's parental rights, it must continue to review the suspension order every sixty days and reconsider whether such an arrangement continues to be in N.W.'s best interests.

The family court's November 10, 2016 decision is affirmed in part, except that the court's restrictions on mother's access to N.W.'s records and contact with school and medical personnel are reversed and remanded for the court to make additional findings consistent with this opinion. The family court's May 10, 2017 and August 24, 2017 orders are affirmed. The family court shall hold a hearing to review the temporary suspension of mother's parent-child contact within sixty days of the date of this opinion.

FOR THE COURT:

_____
Associate Justice

17